Slip Op. 19-65

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| REBAR TRADE ACTION COALITION, <br><br> Plaintiff, <br><br> HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş., <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> REBAR TRADE ACTION COALITION, <br><br> Defendant-Intervenor. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 17-00202 |

## OPINION

[Final Determination sustained as to Habaş.]

Dated: May 31, 2019

Alan H. Price, John R. Shane, and Maureen E. Thorson, Wiley Rein LLP of Washington, DC for Plaintiff and Defendant-Intervenor Rebar Trade Action Coalition.

David L. Simon, Law Office of David L. Simon of Washington, DC for Consolidated Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.

Margaret J. Jantzen, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant, United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel was Reza Karamloo, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Gordon, Judge: This action involves the affirmative final determination of the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation published as <u>Steel Concrete Reinforcing Bar From the Republic of Turkey</u>, 82 Fed. Reg. 23,188 (Dep't of Commerce May 22, 2017) (final determ.), PD 306,[1] and accompanying Issues and Decision Memorandum (Dep't of Commerce May 15, 2017) ("<u>Decision Memorandum</u>"), PD 302 (collectively, "<u>Final Determination</u>"), <u>amended by</u> <u>Steel Concrete Reinforcing Bar From the Republic of Turkey</u>, 82 Fed. Reg. 32,531 (Dep't of Commerce July 14, 2017) (amended final determ.), PD 315 ("<u>Amended Final</u> <u>Determination</u>"). Before the court is the motion for judgment on the agency record of Consolidated Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş").[2] <u>See</u> Pl. Habaş's R. 56.2 Mot. for J. on the Agency R., ECF No. 26[3] ("Habaş Br."); <u>see</u> <u>also</u> Def.'s Resp. in Opp'n to Pls.' Mots. for J. on the Agency R., ECF No. 31 ("Def.'s Resp."); Habaş Reply Br., ECF No. 37 ("Habaş Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C.

---

[1] "PD" refers to a document contained in the public administrative record, which is found in ECF No. 19-1, unless otherwise noted. "CD" refers to a document contained in the confidential administrative record, which is found in ECF No. 19-2, unless otherwise noted.

[2] Plaintiff Rebar Trade Action Coalition ("RTAC") has also filed a motion for judgment on the agency record in this matter that remains pending before the court. <u>See</u> Pl. RTAC's R. 56.2 Mot. for J. on the Agency R., ECF No. 27. The court has stayed consideration of the issues raised in RTAC's motion as they are substantially similar to the issues under consideration by the U.S. Court of Appeals for the Federal Circuit in <u>Rebar Trade Action</u> <u>Coalition v. United States</u>, 42 CIT ___, 335 F. Supp. 3d 1302 (2018), <u>appeal docketed</u>, No. 2019-1228 (Fed. Cir. Nov. 26, 2018).

[3] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

§ 1516a(a)(2)(B)(i) (2012)[4], and 28 U.S.C. § 1581(c) (2012). For the reasons that follow, the court sustains the Final Determination as to Habaş.

## I.       Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

"was reasonable given the circumstances presented by the whole record." 8A <u>West's Fed.</u> <u>Forms</u>, National Courts § 3.6 (5th ed. 2019).

## II. Discussion

### A.      Application of Adverse Facts Available ("AFA") to Habaş

If Commerce finds that a respondent's information is unreliable because the respondent has withheld information that Commerce requests, failed to provide requested information in a timely manner or in the form or manner requested, or significantly impeded the progress of the proceeding, Commerce uses the facts otherwise available. 19 U.S.C. § 1677e(a)(2). Commerce may draw an adverse inference against a respondent in selecting from among the facts otherwise available when it finds that a respondent "has failed to cooperate by not acting to the best of its ability." 19 U.S.C. § 1677e(b).

Prior to applying an adverse inference, Commerce examines a respondent's actions and assesses the extent of the "respondent's abilities, efforts, and cooperation in responding to Commerce's information requests." <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "Acting to the best of its ability" requires that a respondent do the maximum that it is able to do. <u>Id.</u> Although the standard does not require perfection and recognizes that mistakes occur, it does not condone inattentiveness, carelessness, or inadequate record-keeping. <u>Id.</u> Rather, it is the responsibility of a respondent to comply with Commerce's information requests.

In its initial questionnaire, Commerce inquired:

> Did the GOT, or entities wholly or partially owned by the GOT or any provisional or local government, provide, directly or indirectly <u>any other forms of assistance</u> to your company during the [period of investigation ("POI")] and the proceeding AUL period? If so, please describe such assistance, in detail, including the relevant benefit amounts, dates of receipt, and purposes and terms.

<u>See</u> <u>Decision Memorandum</u> at 28 (quoting the initial questionnaire sent to Habaş). During verification, in explaining a contract provision referring to "export-related incentives," Habaş officials informed Commerce that the company "occasionally" received export-related incentives pursuant to Turkey's Domestic Processing Regime ("RDP") Resolution 2005/839 ("RDP program" or "duty drawback program"). <u>Id.</u> When Commerce asked why such benefits were not reported in the company's questionnaire response, Habaş officials asserted that there was "no countervailable aspect" of the duty drawback program. <u>Id.</u> In Habaş's view, the RDP program did not provide "assistance," it did not need to be reported in Habaş's questionnaire response as "other forms of assistance." <u>Id.</u> Commerce rejected Habaş's arguments, noting that "[Commerce], not the interested parties, determines whether or not a response is required." <u>Id.</u> After reviewing the available information about the RDP program and Habaş's failure to timely provide Commerce with information about Habaş's utilization of that program, Commerce determined that "the use of facts available [was] warranted" pursuant to both 19 U.S.C. §§ 1677e(a)(1) and (a)(2). <u>Id.</u> at 29.

Commerce further found that Habaş "did not cooperate to the best of its ability" by failing to timely report its receipt of assistance under the RDP program. <u>Id.</u> Commerce

also determined that Habaş's failure to report "impeded the investigation and precluded the Department from adequately examining the program (i.e., the Department was unable to issue a supplemental questionnaire response to the [Government of Turkey ("GOT")] concerning the extent to which this program constitutes a financial contribution, is specific under sections 771(5)(D) and 771(5A) of the Act, and provides a benefit under section 771(5)(E) of the Act and 19 CFR 351.519." Id. at 29–30.

Consequently, Commerce found that it was appropriate to apply an adverse inference, and "that the unreported RDP duty drawback program meets the financial contribution and specificity criteria outlined under sections 771(5)(D) and 771(5A) of the Act, respectively." Id. at 30. Additionally, Commerce found that the RDP program "confers a benefit under section 771(5)(E) of the Act and 19 CFR 351.519." Id.

Given these findings, Commerce proceeded to apply its "established hierarchy" for selecting an AFA rate for the program, explaining that:

> under the hierarchy, the Department will select AFA rates in the following order of preference: the highest calculated rate for the identical subsidy program in the investigation if a responding company used the identical program and the rate is not zero; if there is no identical program match within the investigation, or if the rate is zero, the highest non-de minimis rate calculated for the identical program in a CVD proceeding involving the same country; if no such rate is available, the highest non-de minimis rate for a similar program, based on treatment of the benefit, in another CVD proceeding involving the same country; absent an above-de minimis subsidy rate calculated for a similar program, the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies.

<u>Decision Memorandum</u> at 30. Applying this hierarchy to the record, Commerce determined that "it is appropriate to apply, as AFA, a rate of 14.01 percent ad valorem," which was the subsidy rate calculated for an export tax rebate program in <u>Final Affirmative Countervailing Duty Determinations; Certain Welded Carbon Steel Pipe and Tube Products from Turkey</u>, 51 Fed. Reg. 1268 (Dep't of Commerce Jan. 10, 1986) ("<u>1986 Welded Pipe and Tube from Turkey Determination</u>"). <u>Id.</u>

Habaş argues that Commerce erred in finding that Habaş's failure to include information about the RDP program in its questionnaire response merited the application of AFA. <u>See</u> Habaş Br. at 3–20. Habaş further contends that, even if Commerce properly determined that Habaş was subject to AFA, Commerce's selection of a 14.01% subsidy rate for the RDP program based on the <u>1986 Welded Pipe and Tube from Turkey Determination</u> was unreasonable. <u>Id.</u> at 20–24.

Habaş contends that its failure to include information about the RDP program in its initial questionnaire response did not merit Commerce's application of AFA because "Commerce's Treatment of the Turkish Drawback Regime Has Been Inconsistent." <u>See</u> <u>id.</u> at 4–11. Habaş argues that because Commerce has decided that the RDP program was not countervailable in prior proceedings, Commerce should not have reasonably expected Habaş to provide information about the RDP program in the present proceeding. <u>Id.</u> Commerce acknowledged that Habaş is correct that "the Department has not consistently examined Turkey's duty drawback program and, in particular, the RDP program at issue in this case;" however, Commerce explained that "[t]he examination and analysis of a particular duty drawback system, including the RDP duty drawback program,

hinges on the specific facts on the record of a CVD proceeding, such as how the government implemented and monitored the system during the POI and whether or not product-specific and company-specific yield factors, including waste rates, are accurate." Decision Memorandum at 29. By failing to report its use of the duty drawback program during the POI, Commerce concluded that "Habas denied the [agency] and other interested parties the opportunity to collect and analyze the information necessary to determine the [] duty drawback program's countervailability in this proceeding." See id.

The court agrees that Commerce's determination as to whether a duty drawback program is countervailable is a fact-intensive examination that the agency is entitled to undertake, and Habaş cannot unilaterally foreclose it by refusing to respond to the agency. See id. at 28–29; see also Essar Steel Ltd. v. United States, 34 CIT ___, ___, 721 F. Supp. 2d 1285, 1298–99 (2010) ("Regardless of whether [the respondent] deemed the [] information relevant, it nonetheless should have produced it [in] the event that Commerce reached a different conclusion . . . ."), rev'd in part on other grounds, 678 F.3d 1268 (Fed. Cir. 2012); Ansaldo Componenti, S.p.A. v. United States, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986) (holding that "it is Commerce, not the respondent, that determines what information is to be provided," despite any claim by respondent that the information request "cannot legally serve as the basis" for the agency's view).

Habaş contends that Commerce erred in its application of AFA by failing to "satisfy the statutory criteria for finding that the drawback program is countervailable." See Habaş Br. at 11 (citing Changzhou Trina Solar Energy Co. v. United States, 40 CIT ___, ___, 195 F. Supp. 3d 1334, 1350 (2016)). Habaş maintains that Commerce failed to

"make a specific factual finding as to whether" the RDP program constitutes a "financial contribution," is "specific," and provides a "benefit" as defined pursuant to 19 U.S.C. § 1677(5). Id. at 11–13. Habaş argues that Commerce's failure to make these factual findings demonstrates that Commerce's determination is not supported by substantial evidence and must be remanded as the court concluded in Changzhou Trina. Id. The court disagrees.

Commerce recognized its statutory obligations in evaluating the countervailability of the RDP program, (pursuant to 19 U.S.C. § 1677(5)), and reasonably applied AFA (pursuant to 19 U.S.C. § 1677e) in finding that the duty drawback program was countervailable as it met all of the statutory criteria. See Decision Memorandum at 29-30. Habaş's argument that Commerce did not make the requisite statutory findings that the RDP program constitutes a "financial contribution," is "specific," and provides a "benefit," does not account for the fact that Habaş's failure to provide information about its use of the duty drawback program is precisely what prohibited Commerce from directly making those findings. Id. ("Because Habas impeded the investigation and precluded the Department from adequately examining the program (i.e., the Department was unable to issue a supplemental questionnaire response to the GOT concerning the extent to which this program constitutes a financial contribution, is specific under sections 771(5)(D) and 771(5A) of the Act, and provides a benefit under section 771(5)(E) of the Act and 19 CFR 351.519), an adverse inference is warranted in selecting the [sic] from facts otherwise available.").

Moreover, Habaş's reliance on <u>Changzhou Trina</u> is unavailing as it is distinguishable given the lack of information in that matter as to the nature of the programs that Commerce determined to be countervailable. See <u>Changzhou Trina</u>, 40 CIT at ___, 195 F. Supp. 3d at 1347–50 (noting that, in contrast to other cases in which Commerce permissibly "applied AFA to a program about which the record contained at least some factual allegations and supporting evidence," Commerce's determination under review lacked "any information, from any source" justifying findings that the "programs and verification grants and tax deduction" at issue satisfied the elements for countervailability."). There, Commerce similarly applied AFA to grants and a tax deduction about which the record was devoid of any relevant information. See <u>Changzhou Trina</u>, 40 CIT at ___, 195 F. Supp. 3d at 1349 (distinguishing Commerce's reasonable application of AFA to infer countervailability as to a particular program in a prior proceeding with Commerce's improper use of AFA to make "sweeping legal conclusion[s] lacking any factual foundation" in the determination under review). In this action, Habaş informed Commerce at verification that it received export related incentives under the RDP program during the POI. See <u>Decision Memorandum</u> at 28. Commerce was familiar with the RDP program because it had examined this program in prior unrelated proceedings; although, as noted by Habaş, Commerce reached different determinations as to whether the program was countervailable depending on the record of each proceeding. See <u>Habaş Br.</u> at 6–9. Accordingly, the court rejects Habaş's argument that Commerce unreasonably failed to "satisfy the statutory criteria for finding that the drawback program is countervailable." See <u>Habaş Br.</u> at 11–13.

Habaş next contends that even if the court concludes that "the finding of countervailability is adequately supported, Commerce has still failed to meet the statutory criteria for its finding [that the use of facts available was warranted]." See id. at 13–17. Habaş argues that Commerce's decision to apply facts available is predicated on 19 U.S.C. §1677e(a)(2)(A) because the agency's explanation referenced Habaş's failure to provide "requested information." See id. at 13. However, Commerce was quite clear in reaching its determination that it was applying facts available pursuant to both § 1677e(a)(2)(A) and § 1677e(a)(1). See Decision Memorandum at 29 ("For these reasons, we find that necessary information is not available on the record, pursuant to section 776(a)(1) of the Act. Furthermore, pursuant to section 776(a)(2) of the Act, the Department finds that Habas withheld information that was requested, failed to provide such information by the appropriate deadlines, and significantly impeded the proceeding …. Consequently, we determine that, in accordance with section 776(a)(1) and (2) of the Act, the use of facts available is warranted." (emphasis added)). Regardless of the merits of Habaş's contention that Commerce erred in concluding that Habaş withheld information pursuant to § 1677e(a)(2)(A), Habaş makes no argument (and the court sees no basis on which to conclude) that Commerce's application of facts available pursuant to § 1677e(a)(1) was unreasonable. Accordingly, the court rejects Habaş's argument that Commerce "failed to meet the statutory criteria" of 19 U.S.C. §1677e(a). See Habaş Br. at 13.

In the alternative, Habaş maintains that even if "Habaş may be considered to have failed to meet the requirement of §1677e(a)(2)(A), Commerce erred in deciding that

Habaş 'did not act to the best of its ability in responding to the Department's requests for information,' as required by 19 U.S.C. §1677e(b)(1)." See Habaş Br. at 17–20. Despite Habaş's claim that it would have needed to be "clairvoyant" to predict that Commerce would want information about Habaş's utilization of the RDP program, see Habaş Br. at 19, the court concludes that Habaş's failure to inform Commerce about its use of the RDP program clearly constituted a failure of Habaş to act to "the best of its ability to comply with a request for information from" Commerce. See 19 U.S.C. § 1677e(b)(1); Decision Memorandum at 29. Habaş's argument that Commerce's evaluation of the RDP program has been inconsistent demonstrates that Habaş was aware that Commerce had previously found the RDP program to provide a countervailable benefit in other proceedings. See Habaş Br. at 6–9 (noting instances where Commerce found Turkish duty drawback countervailable). Even if Habaş was at best confused or uncertain as to whether Commerce would consider the RDP program countervailable, it had an obligation to raise its concerns so that Commerce, not Habaş, could determine whether the program was countervailable in this proceeding. See Essar Steel, 34 CIT at ___, 721 F. Supp. 2d at 1298–99 ("Regardless of whether [the respondent] deemed the [] information relevant, it nonetheless should have produced it [in] the event that Commerce reached a different conclusion . . . ."). Accordingly, the court finds no merit in Habaş's contentions that Commerce acted unreasonably in finding that Habaş's failure to disclose its use of the RDP program merited the application of AFA pursuant to 19 U.S.C. § 1677e(b)(1).

Habaş also argues that even if the court sustains Commerce's determination to apply AFA for its failure to provide information about the RDP program, remand is

nevertheless appropriate because the AFA rate selected by Commerce is unreasonable.

See Habaş Br. at 20–24. Habaş maintains that Commerce's selection of the 14.01% rate

is unreasonable because Commerce could not corroborate the rate from a 32-year-old

terminated program as relevant and reliable pursuant to 19 U.S.C. § 1677e(c) (the

statutory requirements for relying on secondary information). Id.; see also Decision

Memorandum at 30–31 (explaining how Commerce determined that the selected AFA

rate was "corroborated to the extent practicable").

As described above, see supra pp. 5–6, Commerce applied its established

hierarchy for the selection of an AFA rate to assign for Habaş's use of the RDP program.

See Decision Memorandum at 30. Notably, Habaş does not challenge Commerce's

hierarchy for the selection of an AFA rate, but instead challenges only Commerce's

corroboration of the selected rate. See Habaş Br. at 20–23. Specifically, Habaş contends

that despite the fact that the court has sustained Commerce's use of the 14.01% rate in

a prior CVD proceeding as a corroborated AFA rate, that rate (from the 1986 Welded Pipe

and Tube from Turkey Determination) has never been (and cannot be) found to be

"reliable" under 19 U.S.C. § 1677e(c). See Habaş Br. at 20–23 (discussing the selected

AFA rate, statutory corroboration requirements, and distinguishing Özdemir Boru San. ve

Tic. Ltd. Sti. v. United States, 41 CIT ___, ___, 273 F. Supp. 3d 1225, 1247–48 (2017)).

Defendant disagrees with Habaş's reading of Özdemir, and maintains that the court

evaluated Commerce's selection of an AFA rate based on the 1986 Welded Pipe and

Tube from Turkey Determination and "deemed [that rate selection as] sufficiently reliable,

reasonable, and supported by substantial evidence." See Def.'s Resp. at 22 (citing

Özdemir as holding that the "rate was reliable and corroborated because it was calculated in a previous Turkish countervailing duty investigation"). Moreover, Defendant maintains that Commerce properly applied its AFA rate selection hierarchy and, within the discretion afforded to the agency by the relevant statutory scheme, reasonably selected (and corroborated to the extent practicable) the 14.01% rate. Id. at 19–22.

The court agrees with Defendant. Habaş's arguments about the alleged insufficiency of Commerce's corroboration of the 14.01% rate ignore the fact that Habaş's failure to provide the relevant information about the RDP program is what led Commerce to select an AFA rate from a similar program from a previous proceeding involving Turkey. The text of 19 U.S.C. § 1677e(d) provides broad discretion to Commerce, permitting the agency to "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country," and to "apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin." Commerce adhered to its unchallenged hierarchy for selecting AFA rates, and reasonably selected a 14.01% rate because it was the highest non-de minimis rate calculated for a similar program in another Turkish countervailing duty proceeding. See Decision Memorandum at 30 (referring to the 1986 Welded Pipe and Tube from Turkey Determination).

While Özdemir is not binding on the court, it is persuasive as to how and why the rate from the 1986 Welded Pipe and Tube from Turkey Determination may be corroborated by Commerce. See Özdemir, 41 CIT at ___, 273 F. Supp. 3d at 1247–48.

Habaş is incorrect when it contends that Özdemir failed to evaluate the "reliability" of the challenged AFA rate. The court there stated:

> Commerce determined that the CWP & T 1986 rate was reliable because it was "calculated in ... previous Turkey CVD investigations or administrative reviews." Under the limitations articulated by the agency, and under the statutory standard[,] Commerce's statement regarding reliability served the purposes of corroboration "to the extent practicable."

Özdemir, 41 CIT at ___, 273 F. Supp. 3d at 1248 (internal citations omitted). Here, as in Özdemir, Commerce was confronted with a limited record and was forced to select, as an AFA rate, a rate from a "similar" Turkish subsidy program from a prior proceeding. See Decision Memorandum at 30–31. Commerce corroborated this rate to the extent practicable by confirming its relevance and reliability. Id. ("With regard to the reliability aspect of corroboration, we are relying on a subsidy rate calculated in another CVD proceeding. … because the calculated rate was based on information provided for another tariff rebate program (i.e., export tax rebates), it reflects the actual behavior of the GOT with respect to a program that is similar to the RDP duty drawback program.") While Habaş urges the court to conclude that Commerce's analysis is insufficient, Habaş has "not provided binding authority that would impose on Commerce a corroboration standard stricter than that identified in the statute and the legislative history." See Özdemir, 41 CIT at ___, 273 F. Supp. 3d at 1248. Considering the record as a whole, the court concludes that Commerce reasonably corroborated the 14.01% AFA rate as required by § 1677e(c)(1).

Habaş lastly maintains when Commerce did not assign Habaş a rate lower than 14.01%, the agency unreasonably failed to evaluate the "situation that resulted in … an adverse inference". See Habaş Br. at 23–24. Habaş contends that the "'situation' that led

to AFA was that everyone concerned was well aware of drawback in the context of Turkish

steel trade cases in general, and rebar cases in particular, and nobody – not the

petitioners, not Commerce, and not Habaş – thought to 'connect the dots' between this

general knowledge and the specifics of answering the CVD questionnaire." Habaş Br.

at 24. Contrary to Habaş's position, Commerce explained that:

> [t]he Department has previously found that import duty
> rebate/drawback programs may provide countervailable
> assistance to companies importing goods. Although, as noted
> by Habas, the Department has not consistently examined
> Turkey's duty drawback program and, in particular, the RDP
> program at issue in this case, determining the
> countervailability of a duty drawback program requires a fact-
> intensive examination … By failing to report its use of the RDP
> duty drawback program during the POI in response to the
> Department's initial questionnaire, Habas denied the
> Department and other interested parties the opportunity to
> collect and analyze the information necessary to determine the
> RDP duty drawback program's countervailability in this
> proceeding.

Decision Memorandum at 29. Commerce went on to acknowledge Habaş's argument that

Commerce "should consider the fact that, in prior proceedings, [Commerce has] often

calculated de minimis rates for [the RDP Program]," but explained that its selection of an

AFA rate "is guided by an established hierarchy, which does not allow for the use of

de minimis rates." Id. at 30.

Notably, Habaş does not challenge Commerce's "established hierarchy" for

selecting AFA rates, nor does Habaş identify any specific non-de minimis rates that

Commerce may have selected as an appropriate "lesser rate" after an "evaluation of the

situation" pursuant to 19 U.S.C. § 1677e(d)(2). See Habaş Br. at 23–24; Habaş Reply at

4–5. Habaş provides no insight as to how Commerce may have reasonably selected an

AFA rate other than 14.01%, nor does Habaş explain how Commerce may have reasonably reduced such a rate in light of an "evaluation of the situation" under § 1677e(d)(2). Id. Commerce did explain its selection of an AFA rate for the RDP Program in light of the limited facts on the record and the totality of the circumstances. See Decision Memorandum at 31 (noting that "unlike other types of information, such as publicly available data on the national inflation rate of a given country or national average interest rates, there are typically no independent sources for data on company-specific benefits resulting from countervailable subsidy programs"). Commerce further explained how it applied its "established hierarchy" in selecting the 14.01% rate. See id. at 30. Nevertheless, Habaş insists that "Commerce failed to make the analysis required by §1677e(d)(2), and a remand is therefore required." Habaş Reply at 5.

Habaş relies on POSCO v. United States, 42 CIT ___, ___, 296 F. Supp. 3d 1320, 1349 (2018) for the proposition that Commerce must conduct "a separate case-specific factual evaluation" in selecting an AFA rate pursuant to § 1677e(d)(2). POSCO is distinguishable as the court there noted that "Commerce did not expressly state which hierarchical provision(s) it relied on in this proceeding." See POSCO, 42 CIT at ___, 296 F. Supp. 3d at 1335. Here, Commerce explained its straightforward application of its established hierarchy, and found that the 14.01% rate from the 1986 Welded Pipe and Tube from Turkey Determination was "highest rate for a similar program in a proceeding involving Turkey." Decision Memorandum at 30. Moreover, in POSCO the court explained that § 1677e(d)(2) "contemplates a case-specific evaluation as part of Commerce's selection from among a range of rates." POSCO, 42 CIT at ___, 296 F. Supp. 3d at 1349

(emphasis added). The court also clarified that "the issue is not whether Commerce's hierarchical methodology as a whole complies with the statute, but whether Commerce's unexplained selection of the highest rates within each prong of its hierarchy complies with § 1677e(d)(2)." Id. Unlike POSCO, this matter does not involve the comparison of alternative rates available on the record as Habaş has not identified any specific "lesser rates" that Commerce may reasonably have selected. See Habaş Br. at 24 (stating that remand is necessary for Commerce to consider "lesser rates"). Accordingly, the court concludes that Plaintiff's reliance on POSCO is unavailing.

Although Commerce did not expressly cite § 1677e(d)(2) in its explanation of the selection of an AFA rate for the RDP Program, Commerce's explanation provides a reasonably "discernable path" for how the agency selected of the 14.01% AFA rate. See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1321–22 (Fed. Cir. 2009) (The court must sustain a determination "of less than ideal clarity" where Commerce's decisional path is reasonably discernable. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, (1974))). Accordingly, based on the record as a whole, the court concludes that Commerce reasonably selected the 14.01% AFA rate.

## B.    Selection of Natural-Gas Benchmark

In the course of investigating whether Habaş purchased natural gas for less than adequate remuneration ("LTAR"), pursuant to 19 U.S.C. §1677(5)(D)(3), Commerce compared the prices Habaş actually paid for natural gas to a benchmark drawn from an International Energy Agency ("IEA") report. See 19 C.F.R. § 351.511(a)(2) (Commerce's benchmarking regulation for evaluating whether goods or services were provided for

LTAR). As Commerce explained, "Section 351.511(a)(2) of the Department's regulations sets forth the hierarchy of potential benchmarks, listed in order of preference: (1) market prices from actual transaction of the good within the country under investigation (e.g., actual sales, actual imports, or competitively run government auctions) (i.e., 'tier one'), (2) world market prices that would be available to purchasers in the country under investigation (i.e., 'tier two'), or (3) an assessment of whether the government price is consistent with market principles (i.e., 'tier three')." Decision Memorandum at 8. Commerce "found that there was no viable tier one benchmark for natural gas in Turkey during the POI and relied on country-specific industrial natural gas prices published by the International Energy Agency (IEA), which is part of the Organisation for Economic Co-operation and Development (OECD), as a tier two benchmark to calculate the benefit received by Habas under this program." Id. at 9.

Habaş challenges Commerce's reliance on the IEA report as unreasonable, contending that Commerce instead should have used the data submitted by Habaş obtained from Global Trade Information Services ("GTIS") as the preferable data source for constructing a tier two benchmark pursuant to § 351.511(a)(2). See Habaş Br. at 25–28. Commerce rejected the GTIS data proffered by Habaş, stating:

> [T]he specific set of GTIS data on the record of this investigation contains pervasive problems that cannot be corrected without making assumptions that would be unwarranted and unsupported by the record. Specifically, the GTIS data are reported in six substantially different units of measure: M3, TM3, and L, which are units of volume; KG and T, which are units of mass; and TJ, which is a unit of energy. … The conversion factors suggested by Habas do not address this problem. …

The petitioner raised its conversion rate and energy content concerns in its case brief, as well as in earlier factual submissions. However, no party suggested a method for standardizing the GTIS data. Rather, Habas focused its comments on rebutting the petitioner's suggestion that we continue to rely on the IEA, as discussed below. Consequently, without additional information clarifying the nature of the variance in conversion rates, we find that the various units of measure in the GTIS data cannot be harmoniously converted to a single unit of measure that would enable a comparison of the GTIS natural gas prices to Habas' natural gas purchases without introducing unnecessary distortion into the calculations.

Moreover, information on the record of this proceeding indicates that the GTIS data includes shipments of CNG, which, as explained by the GOT, is a different product that is shipped in canisters rather than through pipelines. Based on this fact, it is evident that certain shipments included in the GTIS data (e.g., shipments of natural gas from the Czech Republic to Cuba) are comprised entirely of CNG. Because other shipments between countries connected by pipelines (e.g., shipments of natural gas from Hungary to Croatia) also likely include CNG, it is impossible to identify and remove comprehensively all shipments of CNG from the GTIS data.

Therefore, we believe a more accurate gauge of natural gas prices in the POI is provided by the IEA data, which is reported in a unit comparable to the unit in which Habas was invoiced (i.e., MWh/KWh) and, as such, does not require any conversion. …

For the reasons explained in the <u>Preliminary Determination</u>, we continue to find that the annual OECD Europe natural gas prices for 2015, as published by the IEA, are usable as a tier two benchmark. The IEA annual data do not suffer from the same inconsistencies as the GTIS data.

<u>Decision Memorandum</u> at 22–25.

In its brief before the court, Habaş continues to assail Commerce's selection of the

IEA data as unreasonable; however, Habaş fails to demonstrate why its proffered GTIS

data set is the only reasonable selection on the record, nor does Habaş address the

problem highlighted by Commerce that "no party [has] suggested a method for standardizing the GTIS data." See Habaş Br. at 25–28; see also Decision Memorandum at 24. Instead, Habaş attempts to downplay the significance of the problems with the GTIS data highlighted by Commerce. Habaş argues that its proposed benchmark submission provided Commerce with an analysis of the GTIS data that leaves only a "negligible outlier" of problematic data that "will always find its way into a database, but its existence is not grounds for discarding the entire database." Habaş Br. at 28 (citing Habaş benchmark submission (Mar. 2, 2017), PD 221–222). In the Decision Memorandum, Commerce acknowledged that Habaş proposed a conversion rate for energy units to address some of Commerce's concerns about using the GTIS data, but found that Habaş's proposed energy unit conversion solution did not resolve the problems presented in using that data. See Decision Memorandum at 24 n.155 ("Habas submitted a conversion rate for energy units, KWh, to volume units, M3, based on its own experience. However, for the reasons already explained, if energy content is shipment-specific, Habas's experience does not provide a reliable method for making conversions for other transactions.").

Habaş's arguments, though, fail to address the basis of Commerce's decision. Commerce was presented with the choice of two competing data sets on the record (i.e., the IEA and GTIS data). After consideration of the pros and cons of each data set, Commerce concluded that the IEA data provided a "more accurate gauge of natural gas prices in the POI" that further were "reported in a unit comparable to the unit in which Habas was invoiced." Id. at 24–25. Considering the record as a whole, the court

concludes Habaş has failed to establish that a reasonable mind would have to credit Habaş's position as the one and only correct position on the administrative record. The record more than adequately supports Commerce's conclusion that "the annual OECD Europe natural gas prices for 2015, as published by the IEA, are usable as a tier two benchmark …" and that the "IEA annual data do not suffer from the same inconsistencies as the GTIS data." See id.; see also Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn."). Accordingly, Commerce's selection of the IEA data as a tier two benchmark for natural-gas prices is reasonable.

### III. Conclusion

For the reasons set forth above, the court sustains the Final Determination as to Habaş.

                                         /s/ Leo M. Gordon
                                       Judge Leo M. Gordon


Dated: May 31, 2019
        New York, New York